# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| ROBERT K. WINKLE, | : Case No. 3:17-cv-00045 |
|---|---|
| Plaintiff, | : District Judge Thomas M. Rose |
| | : Magistrate Judge Sharon L. Ovington |
| vs. | : |
| NANCY A. BERRYHILL, Commissioner of the Social Security Administration, | : |
| Defendant. | : |

# REPORT AND RECOMMENDATIONS[1]

## I.  Introduction

The Social Security Administration denied Plaintiff Robert K. Winkle's August 5, 2013 application (protectively filed) for Supplemental Security Income. The denial occurred mainly from the determination by Administrative Law Judge (ALJ) Gregory G. Kenyon that Plaintiff was not under a "disability" as defined under the Social Security Act.

Plaintiff brings the present case contending that ALJ Kenyon's decision is flawed. He contends that ALJ Kenyon failed to properly evaluate the opinions provided by his treating psychiatrist Dr. Mark A. Smith. Plaintiff also argues that the ALJ's assessment of

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff's residual functional capacity—or, the most he could do despite his impairments—did not account for all of his physical and mental limitations. And, Plaintiff maintains that the ALJ failed to place proper weight on the opinions of his treating social worker and mental-health therapist.

The Commissioner takes the counterpoint on each of Plaintiff's contentions and seeks an Order affirming the ALJ's decision.

## II. Background

### A. <u>Plaintiff</u>

Plaintiff asserts that his benefits-qualifying disability began on November 15, 2011. This places him in the category of a "younger person" under social security regulations. 20 C.F.R. § 416.963(c). He remained in this category on the date he filed his application at age 34. Plaintiff earned a GED and took some college classes. He has minimal employment experience. (Doc. #8, *PageID* #s 275-80).

During a hearing held by ALJ Kenyon, Plaintiff testified that he'd experienced episodes of blacking out—"it usually happens with a migraine." *Id*. at 85. Once (in 2014) he blacked out, fell, and hit the back of his head and neck on a wall. The result: He fractured his C5 vertebra. He acknowledged that his neurologist had the blackouts under control, but he still blacked-out twice a month. *Id*. at 85-86.

Plaintiff explained that also he suffered from tremors in his hands and arms, and he has restless leg syndrome. The tremors occur every time he attempts to do something,

even when he's not doing anything. *Id*. at 86.

Plaintiff acknowledged that he has a history of bipolar disorder. He described it as making his mood like a roller coaster. He testified, "Sometimes I go manic. Sometimes I go down. It's just my moods can change like that…." *Id*. at 88. One example he provided involved a failed relationship: "I was dating a girl a few months back, and she absolutely did nothing wrong really, but she just said something, and I just went off on her. And she ended up breaking up with me because of it." *Id*. Plaintiff also experienced anger outbursts with a supervisor at work and with his father. *Id*. at 89-90.

When Plaintiff had a manic phase, it lasted anywhere from fifteen minutes to an hour. *Id*. at 103. He usually experienced these a few times each week. *Id*. Sometimes (30% of the time) he had only one manic phase during a week. *Id*.

Plaintiff has crying spells once or twice a month. He also "has all kinds of trouble concentrating." *Id*. at 91. He explained, "That's one of the reasons why I don't drive a long distance…. And my background, a lot of my education is in computers, and I used to be able to build a computer, basically, with my eyes closed. And now I can't even focus enough to do hardly any computer work at all." *Id*. at 91-92. He continued:

> My nephew wanted—he ordered all the parts and wanted to build his own computer. And I couldn't even focus enough and my hands were so shaky I couldn't even do it for him. I had to sit there and just give him verbal directions and talk him through it so he could do it himself….

*Id*. at 92.

3

When Plaintiff's mood is down, he gets "real depressed." He explained, "I don't even hardly want to get out of bed. And then it just go[es] up and down." *Id*. at 88. He does not leave the house much. He goes out every other day to walk his dog. He also picks up prescriptions and goes to the grocery store. At one point, Plaintiff had a friend he talked with on a daily basis, but he had not seen him in well over a year. Plaintiff declines to do things with his friend because he does not "really get any pleasure out of going out or doing a lot of things that used to be fun for [him]." *Id*. at 91. When he is depressed he has crying spells and will sometimes "just cry out of nowhere." *Id*.

Plaintiff told the ALJ that he sees a therapist, Mr. Newport, every two weeks. This gives him the chance "to vent and talk about a lot of things." *Id*. at 93. As the days go by, however, he gets frustrated. He testified:

> I walk in in worse shape than when I was in there. And he's [Mr. Newport has] even made comments that came off the wrong way, and I kind of…, went off on him, which I apologized for afterwards. But it's just—if things come across wrong, I just—my bipolar just throws me up, and I just freak out, I guess—freak out, just yell, things like that—yell and accuse them of trying to do things that they're not really trying to do and all that stuff.

*Id*. These episodes happen about two or three times a week, primarily with his father.

Plaintiff told ALJ Kenyon that he has hallucinations of people coming after him. A hallucination like this once caused him to jump up and his father kept trying to talk him down. Plaintiff, however, had difficulty calming down because he had "seen a bunch of people with axes and stuff like that that were coming to get [him]." *Id*. at 94. He also

4

sees his mother, who has passed away. He has conversations with her ("She talks to me, and I talk back."). *Id*. He described his other hallucinations as involving people coming at him, telling him he is going to die and he's "not worth anything…." *Id*. He added, "And a lot of times it happens when I'm asleep. So it will wake me up out of a dead sleep, and I just start seeing things." *Id*. After his psychiatrist changed his medication, the hallucinations "have gotten better but they're still pretty… prevalent." *Id*. Plaintiff also has problems sleeping and takes Trazadone (a low dose) and Ambien to help alleviate his sleep problems. *Id*. at 95.

As to his physical activities, Plaintiff testified that he walks his dog about ¼ mile but it takes a lot out of him. This is the farthest he can walk. He is exhausted when he it is over. He does not know how long he can stand in one spot. He can sit "for a while," like when he plays computer games. Sitting does not become a problem until his neck begins to hurt after he is in the same position for too long. *Id*. at 96.

Plaintiff has difficulty shaving his face because his hands shake, causing him to cut his face. He does not do laundry and wears the same clothes for multiple days. *Id*. at 96-97. When asked why he did not do laundry, Plaintiff answered, "I just don't really care. I'm just, you know, in the house. I figure I'm not going out that much. You know, I just—I don't really care." *Id*. at 97. He does not bathe regularly because he just doesn't care to and does not see a need to bathe. *Id*. at 100.

Plaintiff's hobbies are computers and watching TV. He plays games on the

5

computer but cannot focus for more than an hour.  *Id*. at 100.  He tried doing one of his past hobbies, umpiring softball games, but he would get upset easily if someone "started running their mouth," and he would lose focus.  *Id*. at 97-98.

Plaintiff testified that he has "asthma and reactive airway disease."  *Id*. at 98.  He uses inhalers, keeping them in his car and home.  He has a rescue inhaler and a daily inhaler that helps prevent asthma attacks before they start.  When he has an asthma attack, he starts wheezing and cannot breathe.  He added, "It feels like my chest is going to cave in.  And once I get the inhaler, it usually goes away, and I'll have some chest pain afterwards…."  *Id*. at 98-99.

Plaintiff told the ALJ that he cannot work a full-time job because he can neither focus nor tolerate stress.  His "moods are too up and down."  *Id*. at 99.  His hands shake and he has "occasional jerks with shaking."  *Id*.  He thinks it would not be safe for him to work anywhere.

### B.     Medical Evidence

In August 2011, two years before Plaintiff filed his application for Supplemental Security Income, his treating-mental health providers—namely, his treating psychiatrist Mark A. Smith, M.D; Walter F. Foltys, MA, LSW; and Amanda Rush, Psychiatric Nurse Practitioner—signed a letter, explaining that Plaintiff was first seen and evaluated in November 2010.  "At that time, a psychosocial assessment was completed and the diagnosis established… Major Depression, recurrent, severe, without psychotic features

and Dysthymia." (Doc. #8, *PageID* #504; *see PageID* #s 772-75). Psychiatric Nurse Rush confirmed these diagnoses in January 2011. Plaintiff's reported that his symptoms included, in part, feeling depressed all day, every day for longer than 6 months, sleep issues, inability to concentrate of complete tasks, "rather severe anhedonia, and lack of pleasurable activities." *Id.* Between January 2011 and August 2011, Plaintiff's symptoms continued with "some manic episodes where [he] has become more exaggerated in mood, has had some spending sprees, as well as at times losing some of his inhibitions." *Id.* These symptoms resulted in Psychiatric Nurse Rush diagnosing Plaintiff with Bipolar II (rule out). All three of these caregivers believed that Plaintiff "could not work at this time [August 2011] and has not been able to work for at least the time he has been in treatment because of the severity of these symptoms…." *Id.*

Dr. Smith, Mr. Foltys, and Nurse Rush also completed a form in August 2011 opining that Plaintiff was extremely limited ("unable to function … over 50% of the work day or work week") in nearly all areas of mental-work functioning. *Id.* at 506-11.

Two years later, in July 2013, close to the date Plaintiff filed his application for Supplemental Security Income, Dr. Smith wrote that Plaintiff was continuing as an active client and was seeing Dr. Smith for medication management and Kent Freeland for individual counseling. *Id.* at 503. Dr. Smith reported, "[Plaintiff's] diagnosis is Bipolar II disorder (as of 12/28/2011) as evidenced by periods of hypomania interspersed with depressive episodes where [he] reports increased impulsive behaviors. His primary mood

7

issue, however, remains depression. Due to multiple stressors, he is experiencing increased episodes of depression." *Id.* Dr. Smith opined that Plaintiff "is disabled and incapable of sustaining full time employment." *Id.* According to Dr. Smith, this would last for more than 12 months. *Id.*

During the years after his asserted disability onset date (in November 2011) through, and well after, the date he filed his application for benefits (in August 2013), Plaintiff's mental-health caregivers documented his many mental-health symptoms, including depressed mood; flat affect; self-deprecating thoughts; mood swings; paranoia; auditory and visual hallucinations; anxiety; agitation; mania; impulsive behavior (e.g., spending); sleep disturbances; fatigue; easily distracted; feelings of worthlessness; and impaired ability to concentrate. *See e.g., PageID* #s 546-547 (1/2013); 697 (8/2013); 751 (7/2013); 771 (10/2011); 785 (5/2013); 803 (7/2012); 844 (7/2013); 846 (8/2013); 848 (5/2013); 850 (4/2013); 892, 899-900 (2011); 1372 (10/2014); 1394 (3/2014).

Dr. Smith completed a form in December 2014 opining that Plaintiff was extremely limited ("unable to function … over 50% of the work day or work week") in nearly all areas of mental-work functioning. *Id*. at 942-44. He also reported that Plaintiff would be likely to have full or partial day unscheduled absences 5 or more times per month. *Id*. at 944.

In January 2015, Dr. Smith wrote that Plaintiff suffers from "Bipolar Disorder Depressed-Severe with Psychotic features. He struggles with depression, mood swings,

paranoia, auditory and visual hallucinations, and anxiety. He has significant impairments in his ability to concentrate and focus with his illness which also causes memory impairment. Consequently, his ability to learn and process new information in a work setting is significantly impaired. He becomes easily overwhelmed with the stress of work expectations and his psychotic symptoms escalate and he is unable to follow through with work tasks." *Id* at 941. Dr. Smith acknowledged that Plaintiff had made progress under his current combination of medications, and his psychotic symptoms have improved. Yet, Dr. Smith concluded, "While improved, he is not able to work as stress causes an escalation of symptoms. Also, while improved, his focusing and concentration continue [sic] impaired. I feel he is disabled and I do not think he will ever be able to work." *Id*.

Plaintiff has provided an accurate summary of his medical records concerning his physical health and impairments. (Doc. #9, *PageID* # 1917-18). The Commissioner adopts the ALJ's statement of facts and cites additional evidence "as needed." (Doc. #12, *PageID* #1941). Given the parties' respective approaches, repetition of the facts concerning Plaintiff's physical health and impairments is unnecessary.

### III. "Disability" and The ALJ's Decision

To be eligible for Supplemental Security Income a claimant must be under a "disability" as the term is defined by the Social Security Act. *See* 42 U.S.C. § 1382c(a); *see also Barnhart v. Walton*, 535 U.S. 212, 214 (2002). A "disability," when narrowed to its statutory meaning, includes physical or mental impairments that are both "medically

determinable" and severe enough to prevent the applicant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. 42 U.S.C. §§ 1382c(a)(3)(A)-(B).

As noted previously, it fell to ALJ Kenyon to evaluate the evidence pertinent to Plaintiff's applications for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. His more significant findings began at Step 2 and continued through Step 5:

> 2. Plaintiff has the severe impairment of "degenerative disc disease of the cervical spine, status post possible C5 fracture; obesity; a history of syncopal episodes of undetermined etiology; and a bipolar disorder." (Doc. #8, *PageID* #57).
>
> 3. Plaintiff did not have an impairment or combination of impairments that automatically entitled him to benefits under the Commissioner's Listings. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.
>
> 4. Despite Plaintiff's impairments, he retained the ability—his residual functional capacity—to perform less than the full range of light work subject to the following limitations:
>
> (1) occasional crouching, crawling, kneeling, stooping, and climbing of ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) no driving of automotive equipment; (5) no concentrated exposure to temperature extremes, respiratory irritants, or vibrations; (6) limited to performing unskilled, simple, repetitive tasks; (7) occasional superficial contract [sic] with coworkers and supervisors; (8) no public contact; (9) no fast paced production work or jobs involving strict production quotas; and (10) limited to performing jobs in a relatively static work environment in

|   | which there is very little, if any, change in the job duties or the work routine from one day to the next. (Doc. #8, *PageID* #62). |
|---|---|
| 4. | The ALJ also concluded at Step 4 that Plaintiff could not perform his past relevant work. |
| 5. | Lastly, the ALJ determined at Step 5 that there are a significant number of jobs available in the national economy that Plaintiff can perform, and, therefore, he was not under a disability and not eligible for Supplemental Security Income. *Id.* at 67-69. |

## IV. Judicial Review

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers*, 486 F.3d at 241

(citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.  Discussion

Plaintiff contends that the ALJ erred by not placing controlling weight on treating psychiatrist Dr. Smith's opinion and erred by not providing good reasons for placing "little weight" on Dr. Smith's opinions. He reasons that the evidence consistently supports Dr. Smith's conclusions about Plaintiff's mental-work limitations. Plaintiff also maintains that Dr. Smith's opinions are supported by the opinions of several other treating medical sources, namely, Mr. Foltys, Nurse Rush, and Mr. Newport.

The Commissioner contends that the ALJ permissibly discounted Dr. Smith's opinions and the opinions of his colleagues (Foltys, Rush, and Newport). In the Commissioner's view, "Before specifically addressing Dr. Smith's opinion that Plaintiff

12

had 'extreme' and 'marked' limitations in mental functioning, the ALJ specifically noted the day-to-day functioning that reasonably contradicts such proposed limitations." (Doc. #12, *PageID* #1943). The Commissioner emphasizes, "'it is proper to read the ALJ's decision as a whole' and … 'it would be a needless formality to have the ALJ repeat substantially similar factual analyses.'" *Id*. (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004)).

Social security regulations require ALJs to generally extend "greater deference … to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). A treating physician or psychologist's opinions must be given controlling weight when (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citation omitted); *see Gentry*, 741 F.3d at 723. If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). ALJs must also apply this host of factors when weighing the opinions of non-treating medical sources.

13

*Gayheart*, 710 F.3d at 376. Social Security regulations require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544; *see* 20 C.F.R. § 416.927(c)(2).

The ALJ's decision, when read in its entirety and as a whole, as the Commissioner urges, contains two sentences directly relating to Dr. Smith. The ALJ wrote:

> Little weight is … given to the assessments of Dr. Smith, Mr. Foltys, and Ms. Rush, all of whom saw the claimant at Clark County Mental Health (Ex B5F, B10F, and B12F). The claimant's level of mental functioning on a day-to-day basis is not indicative of marked or extreme limitations.

(Doc. #8, *PageID* #65). This cursory consideration of Dr. Smith's opinions falls far short of providing "good reasons" for placing little weight on Dr. Smith's opinions. There is no indication that the ALJ evaluated Dr. Smith's opinion under the treating physician rule or the remaining legal criteria of supportability, consistency, or specialization. The ALJ did not rely on any contrary opinion provided by a medical source of record but instead relied on his own findings regarding Plaintiff's day-to-day functioning. This is not the mandatory analysis required by the regulations and case law, and it fails to provide good reasons—that is, "'specific reasons for the weight placed on a treating source's medical opinions.'" *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996)). The good-reasons "requirement is not simply a formality; it is to safeguard the claimant's procedural rights. It is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that

14

his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not.' Significantly, the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the [treating physician] rule.'" *Cole v. Astrue*, 661 F.3d at 937-38 (6th Cir. 2011) (brackets in *Cole*) (internal citations omitted). The ALJ's brief consideration of Dr. Smith's opinions accomplished none of these goals.

The ALJ erred by relying on the single reason—Plaintiff's day-to-day functioning—to discount the opinions of two non-acceptable medical sources, Mr. Foltys and Psychiatric Nurse Rush. Given that the opinions these medical sources provided, in September 2015 for example, mirrored Dr. Smith's opinions, the ALJ should have evaluated their opinions "'on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.'" *Noto v. Comm'r of Social Sec.*, 632 F. App'x 243, 249 (6th Cir. 2015) (quoting Soc. Sec. R. 06-3p, 2006 WL 2329939 at *3 (Aug. 9, 2006)); *see Cole*, 661 F.3d at 939 n.4 ("The practical realities of treatment for those seeking disability benefits underscores the importance of addressing the opinion of a mental health counselor as a valid 'other source' providing ongoing care.").

Accordingly, the ALJ did not apply the correct legal criteria to Dr. Smith's opinions, or the opinions provided by Mr. Foltys and Psychiatric Nurse Rush, and failed to provide good reasons for the weight he placed on Dr. Smith's opinions.[2]

---

[2] In light of the above review and the resulting need for remand of this case, an analysis of the parties'

## VI. Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

---

remaining arguments is unwarranted.

A judicial award of benefits is unwarranted in the present case because the evidence of disability is neither overwhelming nor strong while contrary evidence is lacking. *See Cole v. Astrue*, 661 F.3d at 940 ("It may be true that, on remand, the Commissioner reaches the same conclusion as to Cole's disability while complying with the treating physician rule and the good reasons requirement; however, Cole will then be able to understand the Commissioner's rationale and the procedure through which the decision was reached. The case must be remanded. 'To hold otherwise ... would afford the Commissioner the ability [to] violate the regulation[s] with impunity and render the protections promised therein illusory.'" (internal citation omitted)).

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Robert K. Winkle was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and any Decision adopting this Report; and

4. The case be terminated on the docket of this Court.

February 12, 2018  *s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).